HERSHEL ABBOTT *v.* C. H. LEAVELL & CO. ET AL

5-4493                                426 S. W. 2d 166

Opinion delivered April 8, 1968

McMath, Leatherman, Woods & Youngdahl and John P. Sizemore, for appellant.

Bridges, Young, Matthews & Davis, for appellees.

PAUL WARD, Justice. This is a Workmen's Compensation case. The Commission adjudged Hershel Abbott (appellant) to have received a 30% permanent disability to his body as a whole. On appeal to circuit court the award was reduced to 20%, hence this appeal. The case arose out of the facts presently mentioned.

On November 4, 1964 appellant suffered a compensable injury while in the employment of C. H. Leavell & Company (appellee). While working with a piece of construction machinery it came in contact with a power line, causing injury to his back and left foot. Appellee paid medical and disability benefits until a hearing was held.

Seeking a reversal of the circuit court, appellant makes only one contention, viz:

"There is substantial evidence to support the award of the Workmen's Compensation Commission."

It is conceded of course that the word "evidence", as used above, means evidence or testimony which the Commission had a right to consider.

It must also be conceded that, if appellant is correct, the trial court erred in reducing the percentage of disability. In *Arkansas Workmen's Compensation* v. *Sandy*, 217 Ark. 821 (p. 826), 233 S. W. 2d 382, there appears this statement:

"On the whole case, there is substantial evidence to support the Commission's finding of fact, and the Circuit Court erred in setting aside the order of the Commission."

In the recent case of *Bradley County et al* v. *Samuel Adams*, 243 Ark. 487, 420 S. W. 2d 900, the rule was emphasized in these words:

"We have held, in cases too numerous to mention, that it is not our province to decide contested issues of fact in compensation cases, that it is the responsibility of the Commission to draw inferences when the testimony is open to more than a single interpretation, and that the Commission's findings have the force of a jury verdict."

Therefore we now proceed to examine the testimony relative to appellant's disability.

Appellant was employed by appellee for one year and three days before he was injured. His principal duties were to drive a motor crane, grease it, and look after an air compressor. His pay was $2.675 per hour. After being hospitalized and treated he returned to work for two months before the job was finished, and his employment was terminated. Shortly thereafter he found a similar job with the Continental Engineering Co., and is now receiving $2.80 per hour. It is not disputed that appellant received an injury to his back and to the lower part of his left leg and particularly to his left foot, necessitating the amputation of the big toe and the toe next to it. He is now wearing a special shoe on the injured foot.

Five doctors examined appellant, and their testimony was presented to the Commission. Since there is no contention here that appellant is not entitled to an award of 20% and since the sole issue here is whether there is substantial evidence to support the Commis-

sion's award of 30%, we set out only the results of the doctors' findings. One doctor fixed appellant's permanent partial disability at 5%, one at 35% and the others ranged from 10% to 17%.

We first point out that appellee correctly (at page 5 of its brief) agrees that the above percentages fixed by the doctors "were made on the basis of physical impairments only and did not purport to consider claimant's wage loss disability", although they made it clear he should be able to return to gainful employment in his former occupation.

After all the testimony had been presented the Commission made the following findings:

"The preponderance of the medical evidence is that the claimant's *anatomical* impairment is in the neighborhood of 15 to 18 percent to the body as a whole." (Emphasis supplied.)

"Based upon the entire record, the Commission concludes that claimant's wage earning capacity has, nevertheless, been diminished and that by combining claimant's *anatomical* impairment and his probable loss in *wage earning capacity,* his permanent partial disability to the body as a whole is 30 percent." (Emphasis supplied.)

It is our conclusion that the record contains testimony which the Commission had a right to consider and which constitutes substantial evidence to support its finding of a 30% disability. Portions of that testimony are mentioned and discussed below.

(a) Attention is called to the fact that one doctor evaluated appellant's disability at 35%. Certainly it must be conceded that medical evaluation is not an exact science, with no chance for error. This case demonstrates the verity of that conclusion, since no two doctors agreed

on the percentage. It is also verified by nearly every case of this kind which reaches this Court. Who then, other than the Commission, has the duty of evaluating such testimony, who is in a better position to do so, and on whom do the statutes impose that responsibility? The answer is too obvious for comment. True, the appellate courts have the last say, as a matter of law, what constitutes "substantial" evidence.

(b) This Court has many times held that certain testimony, other than medical, can be considered in this kind of case. See: *Glass* v. *Edens*, 233 Ark. 786, 346 S. W. 2d 685; *Wilson & Co., Inc.* v. *Christman,* 244 Ark. 132, 424 S. W. 2d 863; *Ark. Best Freight* v. *Brooks,* 244 Ark. 191, 424 S. W. 2d 377, and; *Jones Furniture Mfg. Co.* v. *Evans,* 244 Ark. 242, 424 S. W. 2d 880. In the *Glass* case, in construing Ark. Stats. Ann. § 81-1313 (d), (Repl. 1960), we said it ". . . does not mean merely functional disability but includes, in varying degrees in each instance, loss of use of the body to earn substantial wages". In that case we also said it was error to consider only medical evidence, but that the Commission should also consider the claimant's "age, experience, education, and other matters affecting wage loss". The *Wilson* case approved the *Glass* decision, and; there, we also said that the Commission has never been limited to medical evidence only in arriving at permanent partial disability of a claimant, but that it should consider all competent evidence relating to his incapacity to earn the same wages he was receiving at the time of his injury.

Appellee's contentions for an affirmance of the circuit court, as we understand them, are: one, the Commission could consider only the medical testimony; two, the undisputed proof shows appellant was, at the time of the hearing, receiving 12½ cents per hour more than he was receiving before the injury. For reasons previously stated, we find no merit in the first contention, and, for reasons presently stated, we find no merit in the other contention.

Appellee's contention here is largely, if not entirely, based on Ark. Stat. Ann. § 81-1302 (e) (Repl. 1960) which reads:

"'Disability' means *incapacity* because of injury to *earn,* in the same or any other employment, the wages which the employee was receiving at the time of the injury." (Emphasis supplied.)

We do not, for two reasons, agree with appellee's interpretation of the above section, as applied to the facts in this case.

(1) Construing the above statute in the light most favorable to appellant, as we must, it is emphasized: because appellant is making as much money now as he did before does not necessarily mean he has the "capacity" to earn that much. There is undisputed evidence from which the Commission could well have found, as it did, that appellant did not have such "capacity". One, before the injury appellant was a "driver" and an "oiler", whereas now he can no longer function as a "driver". Two, his present job is that of an "oiler" but he cannot do that job without assistance from his fellow workers.

There is another feature of this case which appellee apparently would exclude but which we think the Commission had a right to consider. It is the position of appellee that the requirement of the statute is met if appellant is *now* making as much money as he did before without any regard for how long he will be able to do so. We think this is a too narrow construction, and would place a great handicap on a claimant. The testimony shows that he has become exceedingly emotional and is in continuous fear of losing his job. Whereas he was a strong, healthy man before and never showed any emotionality, now he cries almost every day when he reaches home, and, at the least provocation, he often cries on the job.

We think the Commission had a right to consider all this evidence, and that it constitutes substantial evidence.

Reversed.

HARRIS, C. J., disqualified.

BROWN & FOGLEMAN, JJ., concur.

LYLE BROWN, Justice, concurring. I concur with the result of the majority; however, I think important facts were omitted that are vital to an understanding of the case. The claimant suffered a compensable injury on November 4, 1964. The injury occurred when the construction crane the appellant was operating came in contact with a power line and he sustained electrical shock and burns. The claimant worked as an oiler and operator for a year and three days. His duties included driving a crane, greasing, and looking after an air compressor, although most of his experience was as an oiler, rather than as an oiler and operator, the latter being a higher paying job.

Oiling consists of operating a grease gun, checking the oil, keeping the machinery clean, and keeping fuel in it. The testimony as to claimant's incapacity is derived from the claimant and two co-workers. In substance it established the following. As a result of the loss of the big toe and the toe next to it, claimant could no longer walk properly. He sustained a fracture of the back that further impaired his mobility. Finally, his nerves no longer can handle the pressures of more demanding jobs such as operator, thereby reducing his ability to move up to a higher paying position.

As far as the physical work involved in oiling is concerned, it is generally not considered strenuous. However, it requires a great amount of climbing and contortions in order to reach all parts of the machine. Since

the injury the claimant has been unable to perform his tasks without the aid of his fellow workers. The grease used comes in five-gallon cans which he is unable to carry. The operators bring it and set it on the machine for him. He has to keep treads cleared of mud. Most oilers have to shovel it, but because of his back injury he cannot. He uses a hoe and must go down the tracks and push the mud off. When the tracks get real muddy some of his co-workers help clean. Before the accident claimant could climb up the boom, and would grease all the jibs and gantries. The company does not permit him to do that now. The operator does the climbing although it is an oiler's responsibility. The claimant concluded, ''And if I didn't have help, I couldn't make it there. Because I couldn't do what they ask the man.''

On claimant's first job, after recovering from the injury, he went back to work; ''he [foreman] found out that I couldn't do the work and I stayed there two months or something near two months and he laid me off. Because I couldn't keep the track rig clean and go up on the gantry and grease it. I happened to catch . . . an operator out of El Dorado, Kansas, and he didn't want to help do anything but his job and, therefore, I didn't make it.'' The claimant testified he gets a job by going over to the union hall and the business agent sends him out to a job. ''Whether I get the job depends on whether or not I can handle it.''

Under Ark. Stat. Ann. § 81-1302(e) (Repl. 1960), '' 'Disability' means *incapacity* because of injury to *earn*, in the same or any other employment, the wages which the employee was receiving at the time of the injury.'' (Emphasis supplied.)

It is admitted that the claimant is earning more than he was when he was injured. Whether that prevents recovery for wage-loss, as distinguished from the medical disability, must be decided.

Three terms used in the statute must be understood.

Those terms are incapacity, earn, and wages. *Wages* is defined by statute. Ark. Stat. Ann. § 81-1302(h) (Repl. 1960). Webster's Second Unabridged Dictionary defines *incapacity* as "Quality or state of being incapable; lack of physical or intellectual power . . ."; it defines *earn* as "To merit or deserve, as by labor or service. . ."

Compensation is paid to those suffering a compensable disability. In order to give the term disability substance and meaning it is keyed to the capacity to earn wages. Larson, *Workmen's Compensation Law,* §§ 57.22 and 57.34 discusses the problem similar to the case at bar. "If the employee, as often happens, returns to his former work for the same employer after his injury, or is offered it, at a wage at least as high as before, there is a strong presumption against loss of earning capacity. . . . Wages paid an injured employee out of sympathy, or in consideration of his long service with the employer, clearly do not reflect his actual earning capacity, and, for purposes of determining permanent disability are to be discounted accordingly. The same is true if the injured man's friends help him to hold his job by doing much of his work for him, or if he manages to continue only by delegating his more onerous tasks to a helper."

The testimony of the medical and lay witnesses substantiates the fact that he is partially incapacitated. That alone does not necessarily affect his ability to earn; however, the additional testimony to the effect that the claimant can only hold his current position if his fellow employees do some of his more onerous tasks indicates that he is not earning his wages within the meaning of the statute.

"The ultimate objective of the disability test is, by discounting these variables, to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured, taking wage levels, hours of work, and claimant's age

and state of training as of exactly the same period used for calculating actual wages earned before the injury. Only by the elimination of all variables except the injury itself can a reasonably accurate estimate be made of the impairment of earning capacity to be attributed to that injury.'' Larson, *Workmen's Compensation Law,* § 57.21.

The Commission here found that the *anatomical* loss was from 15 to 18 per cent ''and that by combining claimant's anatomical impairment and his probable loss in *wage earning capacity,* his permanent partial disability to the body as a whole is 30 per cent.'' (Emphasis supplied.) In construing the statute liberally in favor of the claimant it is reasonable to assume that the legislature intended the word ''earn'' in its usual sense otherwise the word ''receive'' could have been used and would have removed any ambiguity.

I also agree that the claimant is entitled to recover now for future loss of probable earnings based on the incapacity suffered. The reason is that a period of employment representative of future capacity to earn is generally unascertainable. Conversely, the claimant cannot wait out the remainder of his life to see what his wage loss ultimately may be. ''The only possible solution is to make the best possible estimate of future impairment of earnings, on the strength not only of actual post-injury earnings but of any other available clues.'' Larson, *Workmen's Compensation Law,* § 57.21. This I think is exactly what the Commission has done.

FOGLEMAN, J., joins in the concurrence.